IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:18-CV-19-FL

| | |
|---|---|
| CARRIE D. RANDA, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) ) ) ORDER |
| MATTHEW WHITAKER,[1] Acting Attorney General of the United States Department of Justice, | ) ) ) ) |
|     Defendant. | |

This matter is before the court on defendant's motion to dismiss plaintiff's first amended complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 13). Plaintiff responded in opposition to the motion, and defendant replied. In this posture, the issues raised are ripe for ruling. For the reasons discussed herein, defendant's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff, a former Assistant United States Attorney ("AUSA") in the U.S. Attorney's Office for the Eastern District of North Carolina ("USAO"), initiated this action on January 22, 2018, and filed amended complaint on April 17, 2018, claiming that she was unlawfully terminated because

---

[1] Plaintiff's action was initiated against Jefferson Sessions in his official capacity as attorney general. "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Therefore, the court hereby ORDERS the substitution of Matthew Whitaker, in his official capacity as Acting Attorney General, as defendant in this case. See id. ("The court may order substitution at any time . . . .").

of her pregnancy and a disability, and in retaliation for her complaining of discrimination on those grounds, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq., and the Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. §§ 791(f), 794(a), 12203(a). Plaintiff seeks compensatory damages, including back pay with interest thereon, lost benefits, other privileges of employment, non-pecuniary losses, and other damages to be determined at trial. Plaintiff also seeks permanent injunctive relief requiring defendant to hire plaintiff in a permanent, non-probationary AUSA position, and to enjoin defendant and his officers from engaging in any further acts of discrimination and retaliation against plaintiff. Finally, plaintiff seeks costs and reasonable attorney's fees. Plaintiff's complaint includes the charge of discrimination she filed with the Equal Employment Opportunity Commission ("EEOC") on September 7, 2016 ("EEOC Charge" (DE 11-1)), and a proposed separation agreement ("Separation Agreement" (DE 11-2)).

Defendant filed the instant motion to dismiss plaintiff's amended complaint on May 1, 2018. Defendant argues plaintiff fails to state a claim for any of the causes of action alleged in her amended complaint, and asks the amended complaint be dismissed in its entirety. Specifically, defendant asserts plaintiff has failed to show her job performance was satisfactory, that similar situated individuals outside plaintiff's protected class were treated differently, or that the facts give rise to a reasonable inference of discrimination. Defendant also argues that plaintiff did not engage in any protected activity that gives rise to claims of retaliation. In support of his motion, defendant attaches plaintiff's 2015 Performance Evaluation (DE 14-1).[2]

Plaintiff responds in opposition, arguing that she has plausibly stated her claims, and that the

---

[2] As discussed below, the court may consider this evaluation when ruling on defendant's motion to dismiss without converting the motion in to one for summary judgment.

facts alleged entitle her to relief.

## STATEMENT OF THE FACTS

The facts alleged in the complaint[3] may be summarized as follows. Plaintiff was hired as an AUSA in the USAO on or around June 2014. (Compl. ¶¶ 7, 13). As part of the hiring process, plaintiff fully disclosed that she had been diagnosed with a mental health disorder, generalized anxiety disorder with obsessive compulsive components. (Id. ¶ 22). The USAO required plaintiff's therapist to write a letter for her personnel file which represented that she was fit to serve as an AUSA, and to disclose the medication she took to treat her mental health disorder. (Id.).

In plaintiff's final performance rating for 2014, she was rated "successful" in most performance categories, and "outstanding" in the remaining categories. (Id. ¶ 15). Plaintiff's 2014 Performance Evaluation provided positive feedback in all core practice areas. (Id. ¶ 16). Plaintiff's immediate supervisor, Jane Jackson ("Jackson"), as "rating official," and Dennis Duffy ("Duffy"), the then-Chief of the Criminal Division, as "reviewing official," signed plaintiff's 2014 Performance Evaluation on February 19, 2015. (Id. ¶ 17).

In or around late January 2016 or early February 2016, plaintiff advised Jackson that she was pregnant and would be taking maternity leave after the birth of her child. (Id. ¶ 19; EEOC Charge (DE 11-1) at 3). Jackson informed plaintiff that she, in turn, advised both Duffy, and John Bruce ("Bruce"), the Acting U.S. Attorney, of plaintiff's pregnancy. (Compl. ¶ 19; EEOC Charge (DE 11-1) at 3). Sherry Bowden ("Bowden"), the USAO's human resources specialist, was also aware of plaintiff's pregnancy (Jackson, Duffy, Bruce, and Bowden collectively, "EDNC management"). (Compl. ¶ 19).

---

[3] Hereinafter, all references to the "complaint" in the text and to "Compl." in citations are to the amended complaint filed April 14, 2018, (DE 11), unless otherwise specified.

3

On March 1, 2016, plaintiff met with Jackson and Duffy to review her 2015 Performance Evaluation. (EEOC Charge (DE 11-1) at 3). Plaintiff's performance rating for 2015 Performance was "successful." (Compl. ¶ 18). Jackson as "rating official" and Duffy as "reviewing official" signed and dated plaintiff's 2015 Performance Evaluation on February 29, 2016. (Id.). However, plaintiff's 2015 Performance Evaluation also contained negative feedback, including being described as "panicked" or "panicky" in certain comments. (EEOC Charge (DE 11-1) at 2-3). During this meeting, plaintiff informed Bowden, Duffy, and Jackson that she found these comments to be insensitive. (EEOC Charge (DE 11-1) at 2). After this meeting, plaintiff met with Bruce and Bowden, and she reiterated the insensitive nature of being described as "panicky" in her evaluation. (EEOC Charge (DE 11-1) at 2). While plaintiff did not grieve her performance review, she advised Bruce that she takes medication to try to alleviate panic issues based on her diagnosis. (EEOC Charge (DE 11-1) at 2).

Following the March 1, 2016 meeting, plaintiff was removed from training meetings on March 4, 2016, and March 9, 2016, by Jackson and Duffy, for which she was already registered and received approval. (Compl. ¶ 20; EEOC Charge (DE 11-1) at 3). On March 31, 2016, Duffy required plaintiff to submit all emails from various cases she had worked on to management for review. (Compl. ¶ 20; EEOC Charge (DE 11-1) at 3). On April 4, 2016, plaintiff delivered the emails to Duffy and met with him briefly to discuss the reason for requesting plaintiff's emails. (EEOC Charge (DE 11-1) at 4). Duffy said there was nothing wrong, but that plaintiff previously had problems with agents and he was following up on that issue. (EEOC Charge (DE 11-1) at 4). On April 6, 2016, plaintiff sent an email reiterating her desire to follow up on the discussion concerning her emails, and requesting feedback on how to improve, but she received no response

4

from Duffy. (EEOC Charge (DE 11-1) at 4).

In the meantime, in April 2016, plaintiff met with Jackson and Bowden. (Compl. ¶ 25). During that meeting plaintiff stated that she perceived she was being treated unfairly, noted that finding other employment while visibly pregnant would be highly unlikely, if not impossible, and that she perceived EDNC management's treatment of her changed after she announced her pregnancy. (Id.). Jackson and Bowden indicated to plaintiff that she would not be removed. (Id.).

On May 27, 2016, plaintiff was removed from her federal employment. (Id. ¶ 26). During the meeting that day in which Bruce informed plaintiff she was being removed, Bruce repeatedly requested plaintiff sign a separation agreement, which would have waived her right to sue for employment discrimination. (Id. ¶ 29). Plaintiff refused and was escorted off the premises. (Id.).

EDNC management subsequently filled plaintiff's position with J. Bradford Knott ("Knott"), a white male, after plaintiff's removal. (Id. ¶ 27). Knott has been licensed to practice law in the State of North Carolina since 2013. (Id.). Plaintiff also alleges she is aware of at least three male AUSAs with negative performance issues who were reassigned within the EDNC office rather than removed. (Id. ¶ 28).

On September 7, 2016, plaintiff filed a formal complaint of discrimination. (Id. ¶ 9). On October 24, 2017, Defendant issued a Final Agency Decision ("FAD") pertaining to Plaintiff's EO complaint, which Plaintiff received via certified mail on November 3, 2017. (Id. ¶ 10). Plaintiff then filed this action.

Additional facts pertinent to the instant motion will be discussed below.

# DISCUSSION

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.     Analysis

Before turning to plaintiff's substantive claims, the court briefly addresses a procedural dispute regarding what materials may be considered in ruling on the motion to dismiss. Specifically, the parties dispute whether the court may rely on plaintiff's 2015 Performance Evaluation without converting defendant's 12(b)(6) motion into one for summary judgment.

In ruling on a 12(b)(6) motion, the court "may consider documents attached to the complaint, see Fed.R.Civ.P. 10(c) . . . ." Sec'y of State For Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007). Additionally, "[a] court may 'consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" Six v. Generations Fed. Credit Union, 891 F.3d 508, 512 (4th Cir. 2018) (quoting Trimble Navigation, 484 F.3d at 705). "At the motion to dismiss stage, documents attached to a motion to dismiss need not be accompanied

6

by a formal declaration authenticating them." Id. at 512–13.

Here, plaintiff's 2015 Performance Evaluation is integral to the complaint. Plaintiff's complaint incorporates by reference her EEOC Charge, which states "[a]s part of my 2015 Final Performance Rating I was described by Dennis Duffy as 'panicked' or 'panicky' 4-5 times." (Compl. ¶ 9; EEOC Charge (DE 11-1) at 2). Plaintiff also references her performance rating for 2015 as "successful" to support her claim that she met or exceeded the reasonable work expectations of her employer. (Compl. ¶¶ 14, 18). Finally, plaintiff asserts that she requested a meeting with management "following receipt of my 2015 performance review that contained negative feedback." (EEOC Charge (DE 11-1) at 3). Collectively, these assertions show that plaintiff's 2015 Performance Evaluation, which is attached in support of defendant's motion to dismiss, is integral to plaintiff's complaint.

Furthermore, the 2015 Performance Evaluation is authentic. Plaintiff asserts that the evaluation was completed by "Jackson as 'rating official' and Duffy as 'reviewing official'" and the evaluation was "signed and dated . . . on February 29, 2016." (Compl. ¶ 18). The 2015 Performance Evaluation shows both Jackson and Duffy's signatures, and the report is dated as alleged. (2015 Performance Evaluation (DE 14-1) at 1). Additionally, plaintiff concedes the document is authentic. (Pl. Mem. Opp. (DE 18) at 10). Consequently, the court may consider plaintiff's 2015 Performance Evaluation in ruling on defendant's 12(b)(6) motion.

Having resolved the procedural issue, the court turns to the substance of defendant's motion. Plaintiff alleges four different causes of action: 1) wrongful termination on the basis of pregnancy discrimination, 2) retaliation on the basis of her pregnancy, 3) wrongful termination on the basis of disability, and 4) retaliation on the basis of disability. The court then addresses each of these claims

in turn.

### 1. Pregnancy Discrimination

Plaintiff first alleges that her termination "constituted discrimination based on sex and pregnancy/parental status in violation of Title VII." (Compl. ¶ 37).

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

"[I]f a plaintiff is able to produce direct evidence of discrimination, [s]he may prevail without proving all the elements of a prima facie case." McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 584–85 (4th Cir. 2015) (quoting Swierkiewicz v. Sorema N. A., 534 U.S. 506, 511 (2002)). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir.2004)).

In discharge cases, the Fourth Circuit has found that a plaintiff may be able to show different treatment from similarly situated employees where "[plaintiff's] position was filled by a similarly qualified applicant outside the protected class." King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). When determining if plaintiff was treated differently from those outside the protected class, "[t]he similarity between comparators and the seriousness of their respective offenses must be

8

clearly established in order to be meaningful." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008).

Plaintiff alleges she "is aware of at least three male AUSAs with negative performance issues who were reassigned within the EDNC office rather than removed." (Compl. ¶ 28). However, plaintiff has failed to allege "any impropriety was comparable to the acts [plaintiff] was alleged to have committed.." Coleman, 626 F.3d at 191; see Lightner, 545 F.3d at 265. Plaintiff also alleges that EDNC management filled plaintiff's position with Knott, a white male, after her removal. (Compl. ¶ 27). However, as stated before, plaintiff has not alleged Knott had any negative performance reviews as an attorney of comparable severity to plaintiff before he was hired for the current position. Therefore, on the facts alleged, the court cannot infer Knott is a similarly situated member outside plaintiff's protected class.

Plaintiff argues that she need not meet the prima facie case to state a claim under Title VII. Plaintiff relies on Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002). However, plaintiff's reliance upon Swierkiewicz is misplaced. Swierkiewicz relied on the "notice" pleading standard, which was replaced by the "plausibility" pleading standard as articulated in Twombly and Iqbal. See McCleary-Evans, 780 F.3d at 586–88. In evaluating a Title VII complaint under the plausibility standard, the court may consider the prima facie case in reaching the ultimate determination as to whether plaintiff's employer plausibly subjected her to invidious discrimination. See Coleman, 626 F.3d at 190.

For the reasons discussed above, plaintiff's pregnancy discrimination claim fails to plausibly show that she was terminated "because of" her pregnancy. 42 U.S.C. § 2000e-2(a). Plaintiff's alleged comparators are insufficient to show that she was treated differently than similarly situated

employees. Plaintiff's 2015 Performance Evaluation also raises several serious criticisms, including "struggl[ing] with some fairly basi[c] legal concepts," "prosecution memos and plea agreement packages are done very sloppily," and "repeatedly fail[ing] to comply with office policies . . . ." (2015 Performance Evaluation (DE 14-1) at 7-8). Plaintiff's complaint ignores the "obvious alternative explanation" that she was treated differently following her 2015 Performance Evaluation in light of the negative feedback contained therein. See McCleary-Evans, 780 F.3d at 588. Although plaintiff expects the court to draw an inference that this feedback resulted from the announcement of her pregnancy, such an inference is unwarranted in the absence of additional facts, especially where the conduct under review in plaintiff's evaluation occurred in 2015. (2015 Performance Evaluation (DE 14-1) at 1); see Nemet Chevrolet, 591 F.3d at 255.

Based on the foregoing reasons, the court dismisses plaintiff's pregnancy discrimination claim without prejudice.

2. Title VII Retaliation

Plaintiff alleges that defendant unlawfully retaliated by firing her because she engaged in protective activity in complaining about pregnancy discrimination.

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action.

Coleman, 626 F.3d at 190. "Under the applicable legal principles, in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).[4]

The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct." DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015). As a result, "an employee is protected when she opposes not only . . . employment actions actually unlawful under Title VII but also employment actions she reasonably believes to be unlawful." Id. (internal quotation marks omitted). In determining whether an employee's actions constitute protected opposition activity, "the touchstone is whether the plaintiff's course of conduct as a whole (1) communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, and (2) concerns subject matter that is actually unlawful under Title VII or that the employee reasonably believes to be unlawful." Id. at 418 (internal quotation marks and alterations omitted).

Here, the parties solely dispute whether or not plaintiff has engaged in protected activity within the meaning of Title VII. During her April 2016 meeting with Jackson and Bowden to discuss her performance review, plaintiff alleges that she stated "that she perceived EDNC management's treatment of her changed after she announced her pregnancy."[5] (Compl. ¶ 25). Plaintiff's statement requires the court to draw an inference that plaintiff believed EDNC

---

[4] Only one of those categories, opposition, is relevant here. See 42 U.S.C. § 2000e-3(a) (describing "participation" as "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter").

[5] Plaintiff alleges that, following plaintiff's pregnancy announcement, plaintiff had cases taken away from her handling, and she began to receive negative performance appraisals. (Compl. ¶ 20). Plaintiff was also removed from training for which she was already registered and received approval, and was required to turn over case emails to her supervisors, when other prosecutors were not required to do so. (Id.).

11

management were discriminating against her on the basis of her pregnancy by treating her differently after she announced her pregnancy to them. See Nemet Chevrolet, 591 F.3d at 255. This satisfies the first requirement that oppositional conduct convey a belief that the employer engaged in a form of employment discrimination.

Title VII makes it unlawful "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). Plaintiff alleges that, following plaintiff's pregnancy announcement, plaintiff had cases taken away from her handling. (Compl. ¶ 20). Plaintiff was also removed from training for which she was already registered and received approval, and was required to turn over case emails to her supervisors, when other prosecutors were not required to do so. (Id.). It is reasonable to believe these that these changes in treatment would be a violation of Title VII, even if not actually lawful under the statute. Consequently, the second requirement for determining if an action constitutes oppositional conduct is satisfied.

Defendant asserts that plaintiff's complaints are generalized grievances about performance reviews that are not actionable under Title VII. However, the court notes above that in at least one instance, plaintiff complained about different treatment after she announced her pregnancy, but before she was terminated. (Compl. ¶ 25). This allegation is not a generalized grievance, and goes to potential sex discrimination. Addressing plaintiff's factual assertion head on, defendant argues that "plaintiff does not allege that she complained that she had been treated differently because of her pregnancy." (Def. Mem. (DE 14) at 21) (emphasis omitted). The court agrees that plaintiff's allegation does not explicitly state that she complained that she was treated differently because of her pregnancy. However, plaintiff's statement in her April 2016 meeting with Jackson and Bowden

that "she perceived EDNC management's treatment of her changed after she announced her pregnancy" gives rise to an inference that plaintiff was complaining of pregnancy discrimination before she was terminated. (Compl. ¶ 25). The court credits that inference as a reasonable one, as it must under its standard of review for motions to dismiss under rule 12(b)(6). Consequently, plaintiff engaged in protected opposition activity.

Since defendant solely contests whether plaintiff engaged in protected activity, the court does not reach the issue of whether there was a causal connection between plaintiff's statements concerning her pregnancy and her termination. Plaintiff's retaliation claim for pregnancy discrimination is allowed to proceed.

3. Disability Discrimination

Plaintiff's third cause of action alleges that her termination as an AUSA constituted disability discrimination in violation of the Rehabilitation Act. (Compl. ¶ 50).

The Rehabilitation Act provides "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a). A plaintiff shows a Rehabilitation Act violation if she alleges "(1) has a disability; (2) is otherwise qualified for the employment; and (3) was excluded from that employment due to discrimination solely on the basis of her disability." Reyazuddin v. Montgomery Cty., Maryland, 789 F.3d 407, 418 (4th Cir. 2015) (quoting Doe v. Univ. of Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995)). "The third element contains two subparts: (1) an adverse employment action and (2) discrimination based solely on disability." Id.

With regard to the third element of a Rehabilitation Act claim, plaintiff has shown an adverse employment action. (Compl. ¶ 49). However, the facts as alleged by plaintiff do not plausibly show that her termination was solely on the basis of her disability. Plaintiff asserts that comments made in 2015 Performance Evaluation about her being "panicky" or "panicked" are "a reference to her diagnosis of generalized anxiety disorder that had been disclosed to EDNC management in the course of Plaintiff's AUSA background check." (Compl. ¶ 21; EEOC Charge (11-1) at 2). Plaintiff also asserts that Bruce did not know plaintiff was disabled until she met with him to discuss her performance review after the March 1, 2016, performance evaluation review with Jackson and Duffy. (Pl. Mem. Opp. (DE 18) at 21 (citing EEOC Charge (DE 11-1) at 2)).

However, reading the allegedly discriminatory terms in context, the court concludes that the 2015 Performance Evaluation does not show that plaintiff was being criticized for her disability. The thrust of management's criticism in the evaluation is that "[i]t is often the case that after being pressed by defense counsel, either through telephone conversations or if a motion to dismiss is filed, [plaintiff] will require a meeting with management . . . ." (2015 Perf. Eval. (DE 14-1) at 7, 8). Although the 2015 Performance Evaluation also describes plaintiff's demeanor during those meetings as "panicky," the criticism raised is that plaintiff frequently required assistance from management to resolve issues in her cases at a specific stage in the proceedings. (2015 Perf. Eval. (DE 14-1) at 7, 8). This also evident because the performance elements being discussed are "case handling" and "productivity." (2015 Perf. Eval. (DE 14-1) at 7, 8). It is only natural that the USAO would be concerned with an attorney's ability to work independently on his or her cases, without frequently reaching out to management. See Iqbal, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.").

Moreover, the timing of when EDNC management became aware of plaintiff's disability makes her complaint even more speculative on this issue. Plaintiff disclosed her disability to EDNC management around the time that she started her job in June 2014. (See id. ¶¶ 13, 46). Jackson and Duffy reviewed plaintiff's job performance in both 2014 and 2015. (Id. ¶¶ 17, 18). They gave plaintiff good performance reviews for 2014, and gave her reviews with negative feedback in 2015. (See id. ¶¶ 12-13, 2015 Performance Evaluation (DE 14-1) at 3-4). Having known of the disability for some time, and with prior performance reviews being made by the same officials, the length of time that EDNC management knew of plaintiff's disability precludes an inference that the comments in her evaluation were a reference to her disability. See Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991).

Finally, nowhere does plaintiff's complaint or her EEOC charge allege a causal connection between the comments she alludes to in her 2015 Performance Evaluation and her termination. Indeed, all plaintiff alleges in her complaint is that EDNC management made comments on the evaluation that she was "panicky" or "panicked," and "she considered the comments insensitive and wanted them removed from her performance appraisals." (Compl. ¶¶ 46-47). Notably absent from the complaint are any factual allegations supporting the inference that such comments were the basis for her termination. (See, e.g., Compl. ¶ 49; EEOC Charge (DE 11-1) at 3-4). Therefore, the court concludes that plaintiff has failed to show that she was fired "solely by reason of her or his disability." 29 U.S.C. § 794.

Plaintiff cites several cases to support her argument, yet none of those cases are availing. In Woods v. City of Greensboro, the Fourth Circuit reversed a dismissal of a plaintiff's claim for

race discrimination, in part "because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior, and civil rights cases are more likely to suffer from information-asymmetry." 855 F.3d 639, 653 (4th Cir.), cert. denied sub nom. City of Greensboro, N.C. v. BNT Ad Agency, LLC, 138 S. Ct. 558 (2017). However, Woods is distinguishable from the present case because there, plaintiff pleaded facts which supported an inference of discrimination. In Woods, the court found allegations including

> (1) the results of a disparity study demonstrating a pattern of the City almost exclusively lending to nonminority-owned businesses; (2) facts which suggest that the Woods' residence had sufficient equity to fully secure a third-position lien; and (3) examples of how the City has treated nonminority businesses differently, including taking a third-position lien in approving a loan to a nonminority corporation

were sufficient to state a claim of race discrimination. Id. at 648. Here, plaintiff has alleged that certain comments about being "panicked" show discrimination on the basis of disability. (Compl. ¶ 21). Unlike in Woods, where evidence attached to the complaint could support a reasonable belief that the employer engaged in discrimination, plaintiff has not shown her belief that disability discrimination occurred was reasonable for the reasons discussed above. Plaintiff has also failed to sufficiently allege that those comments are causally connected to her termination. (See Compl. ¶ 49). Plaintiff fails to meet the burden the Rehabilitation Act places on plaintiff to allege her termination was "solely on the basis of her disability." 29 U.S.C. § 794(a).

Plaintiff responds that Bruce did not know plaintiff was disabled until she met with him around March 2016 to discuss her performance review and told him about her medications. (Pl. Mem. Opp. (DE 18) at 21 (citing EEOC Charge (DE 11-1) at 2)). However, plaintiff runs in to the same issue here as with her 2015 Performance Evaluation. Nowhere does plaintiff's complaint or her EEOC charge plausibly allege a causal connection between plaintiff's conversation with Bruce

16

regarding her disability and her termination. (See EEOC Charge (DE 11-1) at 2). Moreover, plaintiff's complaint directly contradicts her allegation that she disclosed her disability to EDNC management, which plaintiff asserts includes Bruce. (See Compl. ¶¶ 19, 46). Therefore, plaintiff's argument is unpersuasive.

Consequently, the court grant's defendant's motion to dismiss plaintiff's disability discrimination claim without prejudice for failure to state a claim.

### 4. Disability Retaliation

Finally, plaintiff argues that her removal "constituted retaliation based on disability in violation of the Rehabilitation Act." (Compl. ¶ 56).

Adopting provisions of the Americans with Disabilities Act, the Rehabilitation Act provides "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 29 U.S.C. § 791(f); 42 U.S.C. § 12203(a); see Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001). "Absent direct evidence of retaliation, [plaintiff] may . . . mak[e] a prima facie case of retaliation by showing (1) that [s]he engaged in protected activity, (2) that [defendant] took an adverse action against [her], and (3) that the adverse action was causally connected to [her] protected activity." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty., 819 F.3d 69, 78 (4th Cir. 2016). The anti-retaliation provision of the Rehabilitation Act is interpreted consistently with Title VII precedent. See, e.g., S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 78 (4th Cir. 2016). Consequently, the court applies the same standards for determining what constitutes protected activity as in plaintiff's Title VII retaliation claim. However, plaintiff's complaint fails

to allege facts that plausibly show plaintiff engaged in protected oppositional conduct pertaining to her disability.

Plaintiff rests her retaliation claim on her comments to EDNC management that she believed the comments that she was "panicky" in the 2015 Performance Evaluation were "unfounded, improper, and insensitive." (Compl. ¶ 23). While the court can clearly see plaintiff believed that the 2015 Performance Evaluation was not reflective of her capabilities as an AUSA, the statement fails to convey a belief that EDNC management was discriminating against her on the basis of disability. See DeMasters, 796 F.3d at 418.

Even if the court were to assume that plaintiff was communicating a belief that defendants were engaging in disability discrimination, plaintiff still has not alleged that she engaged in protected opposition activity. As an initial matter, plaintiff does not cite, nor is the court aware of, any law stating that commenting in a performance evaluation on how a disability affects an employee's performance based on standard criteria is actually unlawful. Indeed, statutory provisions protecting an employee's right to request reasonable accommodations for disabilities are premised on employers working with employees to identify problems with job performance caused by disabilities and to find mutually beneficial ways to correct those deficiencies. See 42 U.S.C. § 12112(5)(A).

Nor can plaintiff's belief that disability discrimination occurred be called "reasonable." See DeMasters, 796 F.3d at 418. Plaintiff alleges "as part of the hiring process and background check, EDNC management required [p]laintiff's therapist to write a letter for her personnel file which represented that she was fit to serve as an Assistant United States Attorney, and to disclose what medication she took to treat her mental health disorder." (Compl. ¶ 22). At no point did plaintiff

protest this requirement. Additionally, plaintiff "did not grieve [her] performance review" and told Bruce following her March 1, 2016 performance review that she took "medication to try to alleviate 'panic' issues based on [her] diagnosis." (EEOC Charge (DE 11-1) at 2).

Furthermore, as discussed above, the thrust of management's criticism in the evaluation is that "[i]t is often the case that after being pressed by defense counsel, either through telephone conversations or if a motion to dismiss is filed, [plaintiff] with require a meeting with management . . . ." (2015 Perf. Eval. (DE 14-1) at 7, 8). Although EDNC management subsequently describes plaintiff's demeanor during those meetings as "panicky," the criticism raised is that plaintiff frequently required assistance from management to resolve issues in her cases at a specific stage in the proceedings, not her demeanor during those meetings. (2015 Perf. Eval. (DE 14-1) at 7, 8).

Together, these allegations preclude an inference that plaintiff was reasonable in her belief that defendants were prohibited by law from providing supervisor feedback on a performance evaluation as to how plaintiff's disability affected her fitness to perform the role of an AUSA. Consequently, plaintiff does not allege sufficient facts to show that she engaged in protected opposition activity.

As with plaintiff's pregnancy retaliation claim, the court does not reach the issue of whether there was a causal connection between plaintiff's meetings regarding her performance reviews and her termination. Plaintiff's disability retaliation claim under the Rehabilitation Act is dismissed without prejudice for failure to state a claim.

5.                Leave to Amend

Plaintiff asks that the court grant plaintiff leave to amend her complaint.

The Federal Rules of Civil Procedure provide that, after a defendant files a responsive

pleading, and either leave of court or permission of the opposing party is necessary to amend a complaint, requests for such leave should nonetheless be granted "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has held that, "[i]n the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962).

Here, plaintiff has not filed a proposed amended complaint. Without any proposed amended complaint before the court, it is impossible to determine if any of the factors counseling against granting leave, such as futility of amendment, are present. Therefore, the court denies plaintiff's motion without prejudice to refiling the motion together with a proposed amended complaint.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 13) is GRANTED IN PART and DENIED IN PART. Plaintiff's Title VII retaliation claim is allowed to proceed, however plaintiff's remaining claims are DISMISSED WITHOUT PREJUDICE for failure to state a claim. Having disposed of the instant motion, the court hereby LIFTS the stay on this case, and an initial order on planning and scheduling will follow.

SO ORDERED, this the 2nd day of January, 2019.

LOUISE W. FLANAGAN
United States District Judge